*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | *Criminal No. 07-05-P-H* |
| | ) | |
| RYAN B. BUTTERWORTH, | ) | |
| | ) | |
| Defendant | ) | |

*AMENDED[1] RECOMMENDED DECISION ON MOTION TO SUPPRESS*

The defendant, Ryan Butterworth, charged with possession of a firearm by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), Indictment (Docket No. 1), moves to suppress any and all statements he made to law enforcement personnel on July 2, 2006 after he declined to speak further with them while sitting in a car parked in front of 5A River Street in Westbrook, Maine. An evidentiary hearing was held before me on May 4, 2007 at which the defendant appeared with counsel. I now recommend that the following findings of fact be adopted and that the motion be denied.

**I. Proposed Findings of Fact**

Paul McNeil, a special agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), was among the law enforcement personnel executing a search warrant at 5A River Street in Westbrook, Maine at approximately 6:00 a.m. on July 2, 2006. They were interested in this address, where the defendant and Michael Lovely lived, as a result of a home invasion and shooting in Buxton, Maine, that had occurred in April 2006. A Maine State Police tactical team went into the apartment first and McNeil followed within five to six minutes. The tactical team had between ten and fifteen

---

[1] This recommended decision is amended by the addition of the final sentence under the heading "Notice" at the end of the (*continued on next page*)

fully armed members. The defendant, Lovely and a third person were found in bed in the apartment. In the bedroom where the defendant had been sleeping the searchers found a Dr. Pepper can containing approximately five grams of cocaine and some marijuana in plastic baggies. When McNeil entered the apartment, the defendant was handcuffed and sitting at the kitchen table wearing only boxer shorts.

About an hour after the search had started, the defendant was allowed to dress and was taken outside to McNeil's car which was parked on the street in front of the building. McNeil and Detective Pat Lally from the Maine Drug Enforcement Agency got into the car with the defendant. Within a few minutes after the defendant was put into the car, McNeil read him his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). The defendant stated that he understood his rights and was willing to speak with McNeil and Lally. He appeared to be unusually relaxed for someone who had just been arrested.

McNeil began asking the defendant about the events in Buxton, describing the things that McNeil knew about them, but the defendant said that he did not want to talk about what had happened in Buxton. Lally then asked questions about drug activity at the River Street apartment and the defendant responded in general terms. In time the defendant stated that he did not want to talk any more about that subject. McNeil and Lally asked no more questions about either subject at that time. The defendant did not ask for an attorney while McNeil and Lally were in the car with him. McNeil and Lally got out of the car to discuss the logistics of transporting the defendant, Lovely and the third resident separately to the county jail so that they would not arrive at the same time, in order to minimize the possibility of disruption at the jail. They had been in the car with the defendant for about 15 minutes; it could have been another 45 minutes before the defendant was actually transported.

The defendant was transported by ATF agents Malcolm Van Alstyne and David L. Brown, using Brown's car. Brown, resident agent-in-chief of the ATF's Portland, Maine office for the past

---

recommended decision.

ten years, supervised but did not participate in the search of the apartment at 5A River Street. After getting out of his car, McNeil told Brown that the defendant did not want to speak to McNeil at that time. Brown thinks that it was 30 minutes later when he and Van Alstyne were "tasked" to transport the defendant in Brown's Ford Explorer. Brown drove and Van Alstyne and the defendant sat in the back seat. During the transport the defendant was handcuffed and in leg chains, both of which were attached to a belly chain. The leg chains were put on the defendant after he was read his *Miranda* rights.

Brown and Van Alstyne engaged in casual conversation with the defendant during the transport, which took no more than 15 minutes. As they neared the highway exit for the county jail, Brown began talking about the case at hand and asked the defendant if he was interested in what the agents had to say about the case. Brown did not ask the defendant any questions about the case but tried to lay out the specifics of the drug investigation. He told the defendant that he knew Lovely was selling drugs in the Cumberland Avenue area in Portland and wanted to know where Lovely got the drugs he sold and whether any guns were involved. The defendant seemed relaxed and even a bit cocky. He did not ask to speak to an attorney while being transported. As they got closer to the Congress Street exit, Brown told the defendant that this was his last opportunity to hear what the agents had to say, and the defendant said, "I'll listen to what you have to say."

Brown accordingly drove the defendant instead to the ATF office where the defendant was taken into an interview room and provided with food and drink. After about ten to fifteen minutes, during which McNeil arrived at the office and set up and turned on an audiovisual recording system in an adjacent monitoring room, Brown and Van Alystne began to interview the defendant. The tape recording of that interview is Government Exhibit 1. Brown had an understanding with the defendant that the defendant would listen to what Brown had to say and decide whether he wanted to talk about

the topics Brown presented. The interview began at approximately 9:50 a.m. At the outset Brown asked the defendant whether he remembered his rights as McNeil had read them to him and whether he continued to understand them, to which the defendant replied in the affirmative. During the interview the agents did not specifically ask the defendant whether he wished to make a statement nor did they specifically tell him that the things he said were being recorded and would be used against him. During the interview, the defendant did respond to and/or comment on certain statements made by Brown. The interview ended when the defendant said that he would not speak about the events in Buxton without an attorney and did not want to talk about anything else. Shortly thereafter Brown and Van Alstyne transported the defendant to jail; they did not ask him any questions during the transport.

The defendant did not indicate that he was only going to make a statement, if at all, after hearing everything that the agents had to say. While he responded to certain statements made or questions posed by Brown during the recorded interview, he declined to respond to others. He even told Brown, "That's the oldest trick in the book," when Brown suggested that Lovely might give other agents incriminating information about the defendant.

## II. Discussion

During oral argument at the close of the hearing, counsel for the defendant contended that the agents were required to read the *Miranda* warnings to the defendant again before beginning the interview at the ATF office because "the dynamic changed" when leg and waist chains were added to the handcuffs restraining the defendant and he was told that he was being taken to the county jail. Counsel offered no authority for this position and agreed that these changes would not be an issue if the court were to find that the defendant had been "fully restrained" when McNeil first read the warnings to him. I do not see how the degree of restraint makes a difference here. The defendant was clearly in custody when McNeil first read the warnings to him and that fact did not change at any time

4

before he finally arrived at the county jail.  Once a defendant is in custody, the question becomes whether he understood and waived his *Miranda* rights.  *See, e.g., United States v. Christian*, 571 F.2d 64, 67-68 (1st Cir. 1978).  Here, the videotape demonstrates that the defendant understood his rights and I do not understand counsel to be arguing that he did not.  The only issue at hand is whether the defendant waived those rights,

Before addressing that issue, I note two other arguments made by the defendant in his written submissions but not mentioned in oral argument at the hearing.  First, he contends that the videotape "reveals 'post arrest silence' of the defendant after [*Miranda*] warnings are given" and that "[u]se of such material" would violate his rights to due process of law and to remain silent.  Motion to Suppress Statements and "Post-Arrest Silence" of the Defendant, etc. ("Motion") (Docket No. 21) at [2].[2]  The government responds that it "intends to introduce only brief excerpts from the videotaped interview" in each of which the defendant "explicitly responds to questions posed by Brown."  Government's Opposition to Defendant's Motion to Suppress Statements and "Post-Arrest Silence" ("Opposition") (Docket No. 24) at 12.  The accompanying partial transcript of the interview is marked by the government in a fashion that bears out this representation.  *Id*. n.4 & Exh. 1 thereto.  Given this representation, there is no "post-arrest silence" issue.  The second argument is based on an assertion that "a second round of interrogation began on the way to the Cumberland County jail" in which Brown "made speeches about criminal conduct[] and asked the defendant numerous questions, all of which were clearly designed to weaken the resolve of the defendant or elicit an incriminating response."  Reply to Government's Response Regarding Motion to Suppress ("Reply") (Docket No. 26) at [1]-[2]. There was no evidence presented at the hearing to substantiate this assertion or the

---

[2] Counsel for the defendant is reminded that this court's Local Rule 147(e) requires each page of a memorandum of law to be numbered at the bottom.

5

assertion that Brown "indicated that he did not need the defendant's statements, as the case against the defendant was already overwhelming." *Id.* at [2]. These assertions play no part in my analysis.

A defendant may selectively waive the right to remain silent by indicating a willingness to answer certain questions but not others. *United States v. Eaton*, 890 F.2d 511. 514 (1st Cir. 1989). *See generally Michigan v. Mosley*, 423 U.S. 96, 103-04 (1975). "[W]hen a defendant invokes his right to remain silent,[3] *Mosley* makes clear that the police are not automatically forbidden from later resuming interrogation." *Andrade*, 135 F.3d at 107. Furthermore, invocation of a defendant's *Miranda* rights "does not preclude officers from informing the defendant about evidence against him or about other information that may help him make decisions about how to proceed with his case." *United States v. Washington*, 462 F.3d 1124, 1134 (9th Cir. 2006). *See also United States v. Conley*, 156 F.3d 78, 83 (1st Cir. 1998).

Counsel for the defendant argued, both in writing and orally at the close of the hearing, that the defendant had only agreed to a two-step procedure whereby Brown and Van Alstyne would tell him everything about his case that they wanted him to know and then, and only then, the defendant would decide whether he wanted to make a statement. He contended (i) that the defendant's statements during the interview did not constitute waivers of his invocation of his right to remain silent; (ii) that the agents "undercut" and "*expressly contradicted*," Reply at [3] (emphasis in original), the *Miranda* warnings given by McNeil and of which Brown reminded the defendant at the outset of the taped interview, by telling the defendant that the purpose of Brown's narrative was "just so that you know . . . that we know what's going on in this case" or "so you're clear in your mind that we sort of know what we're talking about;" (iii) that the agents were required to tell the defendant specifically each

---

[3] The standard may well be different if a defendant has invoked his right to counsel, *United States v. Andrade*, 135 F.3d 104, 107 (1st Cir. 1998), but in this case the defendant never invoked this right while in McNeil's car with McNeil and Lally , and, contrary to the defendant's assertion that Brown continued to question him in the taped interview after he had requested counsel, Motion at [1]-
(*continued on next page*)

6

time he spoke during the interview that "this will be used against you" or "if you speak it will constitute a waiver of your right to remain silent," or words to that effect; and (iv) that the agents "softened up the defendant's resolve after his invocation of rights," Reply at [3], by leaving him in the car for an extended period of time and "[t]rick[ed the] defendant into an essentially 'off the record' interaction where he believes he will have an opportunity after that interaction either to stand by his assertion of right or abandon it[,]" *id*.

What the defendant believed at the relevant time may only be inferred from his actions and the testimony of the agents, which I find fully credible. Those actions and that testimony do not support the assertion that the defendant was "tricked" into what he reasonably believed to be an "off the record" colloquy. The fact that Brown began the interview by mentioning the defendant's *Miranda* rights belies that interpretation, as does the defendant's demeanor during the interview. I reject as well the assertion that anything Brown said to the defendant either expressly contradicted or undercut the *Miranda* warnings. That argument goes much too far. I also reject the contention that a defendant who has been given *Miranda* warnings, after which he has refused to talk about certain subjects but has not refused to talk at all with law enforcement personnel, is entitled to renewed, specific warnings each time he volunteers information to law enforcement personnel or answers a question posed by them.

The defendant cites no authority for his contention that the agents must have intended to "soften him up" for further questioning by leaving him alone in McNeil's car for up to 45 minutes and that such activity renders any subsequent statements by the defendant inadmissible. In the one case I was able to locate in which a similar argument was made, the court found that a much longer interval, coupled with expert psychological testimony, was not sufficient to bar the admission of the defendant's statements.

---

[2], the evidence establishes that Brown terminated the interview when the defendant said that he wanted to speak to an attorney.

7

*Mickey v. Ayers*, 2006 WL 3358410 (N.D. Cal. Nov. 17, 2006), at * 3-*5 (defendant made statements after arrest in Japan during flight to Honolulu; expert testified that defendant unusually suggestible). Indeed, leaving a defendant alone for a significant period of time between attempts at questioning is a positive element in most *Miranda* analyses. *See, e.g., United States v. Pettiford*, 295 F.Supp.2d 552, 563-64 (D. Md. 2003) (one hour interval). The defendant is not entitled to suppression on this basis.

It is not reasonable to conclude that Brown induced the plaintiff to believe that he could say anything he wanted to Brown during the interview "off the record" and that only anything he said after Brown indicated that he had finished talking could be used against him. The "two-step" procedure that the defendant now posits as a sort of contract between him and Brown at the time simply was neither explicit nor necessarily implied in Brown's statements to the defendant before the interview. A scenario in which Brown provided the defendant with some of the information he had about the crimes in which Brown was interested and then asked whether the defendant was interested in responding or revealing more information before moving on to provide the defendant with additional information is fully consistent with what Brown and Van Alstyne testified that Brown said to the defendant during the transport.

Finally, the defendant contends that merely speaking with the agents was not necessarily a waiver of his rights. Again, he cites no authority in support of his position. While mere silence after hearing a recitation of his rights under *Miranda* does not constitute a waiver by a defendant, it is not necessary that he execute a written waiver or explicitly state his intent to waive those rights. Silence, "coupled with an understanding of his rights and a course of conduct indicating waiver, may . . . support a conclusion that a defendant has waived his rights." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). "What is required is a clear showing of the intention, intelligently exercised, to relinquish a known and understood right." *United States v. Garcia*, 983 F.2d 1160, 1169 (1st Cir. 1993). That

8

is what is presented here. The defendant manifested a clear understanding of his right to remain silent, invoking it selectively. "A waiver of *Miranda* rights . . . may be implied when, after having received *Miranda* warnings, a criminal defendant responds selectively to questions posed to him." *Bui v. DiPaolo*, 170 F.3d 232, 240 (1st Cir. 1999). A defendant's continuation of a conversation with law enforcement officers after answering "no" to the question whether he had something to say about the reasons for his arrest "both negated any effect his prior response may have had as an assertion of his right to remain silent and confirmed that the interview was indeed a back-and-forth exchange," a circumstance in which the courts "regularly have found waivers," *id*. at 241, 240. The defendant is not entitled to suppression of any statements he made during the interview with Brown and Van Alstyne.[4]

### III. Conclusion

For the foregoing reasons, I recommend that the proposed findings of fact be adopted and that the motion to suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

---

[4] Counsel for the defendant stated at oral argument that the defendant seeks suppression of any statements made after he invoked his right to remain silent in McNeil's car. The only evidence of any possibly inculpatory statements made by the defendant that was presented at the hearing involved statements made during the videotaped interview with Brown and Van Alstyne at the ATF office.

9

*Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the district court and to appeal the district court's order.*

*Unless the district judge directs otherwise, the objecting party must promptly arrange for transcribing the record, or portions of it, in accordance with Fed. R. Crim. P. 59(b)(2).*

Dated this 9th day of May, 2007.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge